**William Peter CAREY, Petitioner,**

v.

**CIVIL AERONAUTICS BOARD,
Respondent.**

**No. 5551.**

United States Court of Appeals
First Circuit.

March 11, 1960.

Lane McGovern, Boston, Mass., with whom John P. O'Brien, Chicago, Ill., and Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., were on brief for petitioner.

Morris Chertkov, Attorney, Civil Aeronautics Board, Washington, D. C., with whom Robert A. Bicks, Acting Assistant Attorney General, Richard A. Solomon, Attorney, Department of Justice, Franklin M. Stone, General Counsel, Civil Aeronautics Board, John H. Wanner, Deputy General Counsel, and O. D. Ozment, Associate General Counsel, Washington, D. C., Litigation and Research, were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

The petitioner, a resident of Massachusetts, and a senior airlines pilot for Northeast Airlines who had flown approximately 10,800 hours and who had held an Airline Transport Rating for 10 years, was the pilot in command of a Northeast Airlines DC–3A scheduled to fly on November 30, 1954, from New York to Boston as Flight 656, and, after a layover of about half an hour in Boston, on to Concord, Laconia and Berlin, New Hampshire, as Flight 792. The flight from New York to Boston was conducted under visual flight rules (VFR) and was routine. So also was the flight on from Boston to Concord and Laconia. On the take-off from Laconia Captain Carey was advised through Northeast Airlines radio facilities that the Boston Air Route Traffic Control Center (ATC) of the Civil Aeronautics Administration had granted previously requested instrument flight rules (IFR) clearance to fly over North Conway, New Hampshire, to the Berlin Airport as follows: "ATC clears Northeast Flight 792 for an approach to the Berlin Airport via Blue 63 to cruise 8000'." While making an instrument approach in clouds to the Berlin Airport the plane struck the top of Mount Success about 7 nautical miles southeast of the airport. The crash caused fatal injuries to the co-pilot and a Northeast Airlines dispatcher riding in the plane, severe injuries to Captain Carey, minor injuries to the stewardess and passengers on board and extensive damage to the aircraft. On December 2 the survivors were rescued by helicopter.

On May 3, 1955, the Administrator of Civil Aeronautics, invoking the jurisdiction conferred on the Civil Aeronautics Board by § 609 of the Civil Aeronautics Act of 1938, 52 Stat. 1011, 49 U.S.C.A. § 559 [1], filed a complaint against Captain Carey alleging in substance that while pilot in command on the flight de-

1. As of December 31, 1958, the Civil Aeronautics Act of 1938 was supplanted by the Federal Aviation Act of 1958, 49 U.S.C.A. § 1301 et seq., but this is unimportant here for § 1501 of the latter Act provides for continuation under the provisions of the earlier Act of proceedings such as this which were pending at the time of the change.

scribed above he descended below the initial approach altitude specified by the applicable regulations governing approach to the Berlin Airport. Specifically, the charges were that Captain Carey descended below 8000′ altitude in the approximate vicinity of Gorham, New Hampshire, some miles short of the Berlin Airport, in violation of section 609.8 [2] of the Administrator's Regulations as amended thereby violating section 40.-409(a) [3] of the Civil Air Regulations and by the same conduct also violated sections 610.663 [4] and 610.5 [5] of the Administrator's Regulations thereby violating section 60.17 [6] of the Civil Air Regulations. On the basis of these charges it was alleged that Captain Carey operated the aircraft "in a careless and reckless manner" and "failed to exercise the degree of care, caution and judgment required of the holder of an Airline Transport Rating." Wherefore it was requested that the Airline Transport Rating of Captain Carey's airman certificate be revoked for lack of qualification. Subsequently the Administrator was allowed to amend his complaint to conform to the language of the statute to be considered hereinafter by adding an allegation that Captain Carey's conduct on the flight demonstrated his lack of qualification to hold an Airline Transport Rating "sufficient to justify a re-

fusal by the Administrator to issue a like certificate to him."

Captain Carey in his answer did not deny, as indeed the event proved, that he approached the Berlin Airport at an altitude less than 8000′, for Mount Success is less than 4000′ high. But he asserted that the crash of his flight was not caused by any lack of qualification on his part but by a combination of factors for which he was not responsible. These included 1) failure of the Berlin approach plate in the Northeast Airlines pilot's manual to show clearly in graphic form that 8000′ was the minimum approach altitude prescribed by the official Regulations of the Administrator, 2) faulty operation of the Automatic Direction Finder (ADF) equipment in the plane, the needle of which reversed prematurely, thereby indicating arrival over the Berlin airfield, at a point which subsequently turned out to be several miles short of the field, and 3) extremely bad weather, the plane bucking a "mountain wave condition" of which he was not forewarned, causing great turbulence and severe vertical air currents which made it very difficult to control the plane as to both altitude and speed.

After hearing in November, 1957, three years after the accident, the trial examiner found against Captain Carey on every issue in the case, and indeed, on

2. Section 609.8 provides: "If an ADF instrument approach is conducted at the below named airport, it shall be in accordance with the following instrument approach procedure * * *." Minimum altitudes shall correspond with those established for en route operations in the particular area as set forth below:
"To Berlin, N.H., from North Conway, N.H. minimum altitude 8000 feet." (19 Fed.Reg. 5663, September 8, 1954.)

3. Section 40.409(a) provides: "When making an initial approach to a radio navigation facility under IFR * * * an airplane shall not descend below the pertinent minimum altitude for initial approach specified by the Administrator for such facility until arrival over the radio facility has been definitely established; * * * *".

4. Section 610.663 provides: "Blue Civil Airway No. 63 amended by adding: 'From Laconia, N.H., to North Conway, N.H., 6000 feet, and from North Conway, N.H., to Berlin, N.H., 8000 feet minimum altitude.'" (19 Fed.Reg. 6178, Sept. 28, 1954.)

5. Section 610.5 provides: "Except when necessary for taking off or landing no person shall operate an aircraft below IFR along the routes or portion thereof designated * * * below the altitude prescribed for such routes."

6. Section 60.17 provides: "Except when necessary for taking off or landing, no person shall operate an aircraft below * * * (d) The minimum IFR altitude established by the Administrator for that portion of the route over which the operation is conducted * * *."

some other issues not raised by the pleadings. He found that Captain Carey failed to make proper use of available weather information before leaving Boston, that he failed to adhere to his ATC clearance to maintain 8000' altitude until he reached the "H" facility at Berlin, and that he failed properly to monitor his ADF or other equipment while attempting a "straight-in" approach to the Berlin Airport. The trial examiner further found that when Captain Carey reached a point in flight where conditions were so perilous that he was in grave doubt as to the outcome of the flight he failed to "pull up on top" where he knew the wheather was fair (VFR) thereby demonstrating carelessness in violation of Civil Air Regulation 60.12 [7] and lack of sound judgment, which, standing alone, "could be considered a lack of qualification" to hold an airline transport rating. In addition the trial examiner found the evidence insufficient to establish that the ADF indicator reversed prematurely but on the contrary showed that it and other radio facilities were functioning properly, that Captain Carey failed to "overhead" the radio facility at North Conway and failed to make necessary radio reports which indicated "a pattern of indifference and carelessness," and that the evidence did not establish either the existence or non-existence of a "mountain wave" in the vicinity of Berlin but that even if such a condition had been shown to exist Captain Carey by his own admissions made no attempt to avoid the hazardous conditions which he claimed to have encountered. On the basis of these findings the trial examiner concluded that Captain Carey had "demonstrated a lack of qualification to hold an airline transport pilot rating sufficient to justify a refusal by the Administrator to issue a like certificate to him" wherefore he recommended that Captain Carey's airline transport rating be revoked and that no similar rating be issued to him for a year.

On appeal the Civil Aeronautics Board concluded that certain of the findings of the trial examiner were unnecessary to its decision so that there was no need for it to decide whether those findings were supported by the evidence. These findings were 1) that Captain Carey was attempting a "straight-in" approach to the Berlin Airport, 2) that when he reached a point where conditions became so perilous that he was in serious doubt as to the outcome of the flight he failed to "pull up on top" where he knew the weather was good, and 3) that he had failed to make "other necessary radio reports besides failing to overhead the radio facility at North Conway as required by company regulations." Nevertheless the Board said that it was persuaded that Captain Carey by his actions demonstrated extreme carelessness and lack of sound judgment in the operation of his flight and that the record showed a series of commissions and omissions which indicated that he "failed to exercise the degree of care, skill, judgment, and responsibility required of the holder of an airline transport pilot rating." The Board then listed the "most important" of Captain Carey's faults as his failure "(1) to familiarize himself with the weather forecasts for the area prior to his departure from Boston and to make proper use of such weather information as he did have; (2) to maintain the minimum 8000 feet altitude from North Conway until he passed over the radio navigational facility at Berlin; (3) to adhere to his ATC clearance to maintain the minimum altitude prescribed by the Administrator for Blue Airway 63 en route; (4) to properly monitor his ADF and other equipment; (5) to overhead the radio facility at North Conway as required by company regulations; (6) to follow the standard instrument approach procedure as established by the Administrator; and

---

**7.** Section 60.12
  "Careless or Reckless Operation.
  "No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others."

(7) to avoid the hazardous conditions which he encountered."

On the basis of these findings the Board affirmed the trial examiner's initial decision "as modified" and ordered Captain Carey's "airline transport rating certificate" revoked effective June 23, 1959 [8]. But, because of the Administrator's and the examiner's delays in prosecuting the case, it did not (one member dissenting) attach to its order the condition that Captain Carey could not apply for a new "certificate" until one year thereafter.

Section 609 of the 1938 Act, 52 Stat. 1011, as amended, see 49 U.S.C.A. § 559, provides that the Civil Aeronautics Board " * * * upon notice and hearing, may alter, amend, modify, or suspend, in whole or in part, any * * * airman certificate * * * if the interest of the public so requires, or may revoke, in whole or in part, any such certificate for any cause which, at the time of revocation, would justify the Administrator of Civil Aeronautics in refusing to issue to the holder of such certificate a like certificate."

■■ We agree with the Board that an airline pilot's conduct on a single flight may show a degree of lack of flying skill, carelessness, recklessness, poor judgment or lack of emotional control sufficient to justify the Administrator of Civil Aeronautics in refusing to issue a certificate to him, and thus warrant Board action under the above statute revoking in whole or in part his airman's certificate. See Specht v. Civil Aeronautics Board, 8 Cir., 1958, 254 F.2d 905.

The question in this case is whether the series of faults found by the Board to have been committed by Captain Carey on the flight in question added together warrant the Board's order, for it is clear that the Board, unlike the examiner, did not rest its order on any single finding of fault standing alone but on the sum or totality of its findings of fault. Thus if any one of its specific findings is infected with error, the Board's ultimate conclusion cannot stand and the case must go back to the Board for further study. But we need not analyse each separate finding of the Board in complete detail, for we think that the case must go back to the Board for correction of obvious errors in some of its findings and the clarification of others.

■ There can be no doubt on the evidence in the record, indeed Captain Carey concedes, that he descended from 8000' into clouds in the vicinity of Gorham, New Hampshire, several miles short of the Berlin Airport, and that he was flying at an altitude of about 5500' when he said his ADF reversed indicating to him that he was over the airport and that he thereupon started his instrument approach to the field and while making the maneuvers required for that operation crashed into Mount Success. Thus it is clear from Captain Carey's own version of the accident that he did not maintain 8000' altitude even up to the point where he thought, obviously erroneously, that he was over the Berlin Airport. Thus the Board's finding (3) above that Captain Carey failed "to adhere to his ATC clearance to maintain the minimum altitude prescribed by the

8. Subsequently, after the petition for review had been filed in this court, the Board purported to amend its order to make its sanction run against Captain Carey's "rating" instead of his "certificate." The effect of this amendment was to make it clear that Captain Carey was not disqualified from flying commercially at all but only that he was forbidden to fly as a captain in command of a scheduled airline flight. There is serious doubt of the Board's power to make this amendment, for § 1006 of the 1938 Act as amended, 49 U.S.C.A. § 646, provides that once a petition for review has been filed in a court of appeals and a copy transmitted to the Board "the court shall have exclusive jurisdiction to * * * modify * * * the order complained of." Since the Board's modification is perhaps only in clarification of its order, and is to Captain Carey's advantage, we overlook the question of the Board's jurisdiction to make it.

Administrator for Blue Airway 63 en route" is correct [9].

But, as we have already pointed out, the Board did not rest its ultimate conclusion of revocation on this finding of fault alone, but on the sum of all of its findings of fault added together. We therefore turn our attention to the Board's other findings.

It seems to us that the Board's findings (2), (5) and (6), *i. e.*, failure to maintain 8000′ altitude from North Conway to the radio facility at Berlin, failure to overhead the radio facility at North Conway as required by company regulations [10], and failure to follow the standard approach procedures established by the Administrator are not findings of faults separate and apart from the broad finding of fault covered in (3), that Captain Carey failed to adhere to his ATC clearance. These findings (2), (5) and (6) are statements of specific ways in which Captain Carey committed the fault found in (3). They are particularizations or specifications of the fault found in (3), not findings of faults separate and apart or in addition to the fault found in (3).

This is clearly so with respect to finding (2) that Captain Carey failed to maintain 8000′ altitude from North Conway to the radio navigational facility at Berlin. Moreover, the Board's findings (5) and (6) are infected with error even as findings of the specifications of the fault found in (3).

■ The Board's finding (5) that Captain Carey failed to overhead the radio facility at North Conway is clearly inconsistent with the Board's previous statement that it was unnecessary for it to decide, so that it need not consider the

evidence to support, the finding of the examiner that he did not do so. And the Board's finding (6) that Captain Carey failed to follow standard approach procedures is far from clear. It can be construed as inconsistent with the Board's statement that it was passing as unnecessary to decide the question of the sufficiency of the evidence to support the examiner's finding that Captain Carey was attempting a "straight-in" approach. But if it is not, we do not know quite what is meant by the finding. If it means that Captain Carey started his approach procedures at too low an altitude it is correct, but amounts to no more than another specification of the fault found in (3) of failing to adhere to IFR clearance. If it means that approach procedures were started too soon, the finding is also correct, for Captain Carey said that he started approach procedures when the ADF needle reversed indicating to him that it was time to do so, although, of course, he was not then over the airport where he thought he was, but several miles short of it. But in this event the crucial issue is not whether he failed to follow established approach procedures, but whether he was at fault in starting those procedures too soon, and this raises the question whether the ADF reversed prematurely or not, and if it did, whether he should have discovered that error by more careful aural monitoring of the device. If, on the other hand, the finding means that Captain Carey was making no attempt to follow standard instrument approach procedure at all, but was attempting a straight-in approach, the finding is either open to the defect of inconsistency pointed out above or else it is wholly without support in the evidence for there is nothing whatever to

9. The most that can be said in excuse of Captain Carey's conduct is that he may have been misled by lack of clarity of the approach plate of his pilot's manual or by the ATC clearance given to him by his company, for that clearance was to "cruise 8000′" and the C.A.A. Flight Information Manual of May 25, 1954, provides: "The term 'cruise' rather than 'maintain' is used in air traffic clearance to signify that descent may be commenced

at pilots' discretion." But whether Captain Carey was justifiably misled, and if so, its effect in mitigation of his fault are matters for the Board to decide.

10. Incidentally Captain Carey was not charged with violating company regulations and we are not cited to any Regulation of the Administrator or the Board requiring compliance with company safety rules.

contradict Captain Carey's testimony that he was following those procedures, at least as to course, albeit prematurely, when the crash occurred.

Other findings of the Board seem to us to be supported by little if any convincing evidence. One of these is the finding that Captain Carey failed to "properly monitor his ADF and other equipment," the evidence being that Captain Carey could not remember whether he was aurally monitoring the ADF himself or whether his co-pilot was doing so, and the evidence is at best vague as to what, if any, other equipment useful in the Berlin area for the same purpose as the ADF was in the plane. And another is the finding that Captain Carey failed to familiarize himself with weather forecasts for the Northern New England area prior to his departure from Boston, for the evidence is that he familiarized himself with the forecasts for that area before he left New York and picked up such weather bulletins as were handed to him by the dispatcher in Boston, and there is no evidence that later area forecasts than he received in New York an hour and a half earlier were available to him in Boston.

Moreover we think the Board's finding that the ADF instrument did not reverse prematurely needs more careful consideration. This finding is directly contrary to Captain Carey's undisputed testimony and can rest only upon the testimony of experts who removed the external portions of the instrument from the plane after the crash and examined it some six months later in a laboratory. These experts, however, did not remove the wiring connecting the external portions of the instrument with the indicator on the plane's instrument panel and made no test of the wiring in the plane, which they admitted might be defective and could cause reversal. Nor does the Board's finding take into account the testimony of the Administrator's radio specialist mentioned by the Board in a footnote that "not only atmospheric conditions but also unknown nebulous failures within the equipment itself" could cause premature reversal. Furthermore, there seems to us at least the possibility of inconsistency between the Board's passing over as unnecessary for it to decide the examiner's finding that Captain Carey was at serious fault in not pulling up out of the clouds where he knew the weather was clear when he encountered such bad weather conditions near the ground that he was in doubt of the outcome of the flight and the Board's finding of fault (7) that Captain Carey failed to avoid the hazardous weather conditions he encountered.

However, since this case must go back to the Board for correction and clarification of several of its findings, we leave all of them for the Board to reconsider in the light of a more thorough, careful and painstaking reevaluation of the record.

■■ The statutory mandate of 49 U.S.C.A. § 402(b) directing the Board to regulate air transportation in such a manner as, among other matters, to "assure the highest degree of safety" imposes heavy responsibilities. Those responsibilities, however, must be carried out with due regard for the serious consequences to a senior airlines pilot of the loss of his air transport rating for fault. Nothing can now be done about the Board's self-confessed delay in processing this case in spite of the provision in § 559 of Title 49 U.S.C.A. that in these matters the Board "shall enter upon a hearing which shall be disposed of as speedily as possible." That is water over the dam. But the parties to proceedings before the Board are entitled to at least reasonably clear and consistent findings as well as findings supported by substantial evidence in the record considered as a whole. We are constrained to say after careful consideration of the record that the Board's work in this case does not meet legal requirements of thoroughness, care, precision and accuracy.

Decree will be entered setting aside the order of the Board and directing it to take further proceedings not inconsistent with this opinion.