NORTHEAST AIRLINES, INC.,
Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent (two cases).

Nos. 6220, 6233.

United States Court of Appeals
First Circuit.

May 8, 1964.

Clarence I. Peterson, Boston, Mass., with whom Henry E. Foley, Boston, Mass., Chester C. Davis, New York City, Foley, Hoag & Eliot, Boston, Mass., and Wilmer, Cutler & Pickering, Washington, D. C., were on brief, for petitioner.

O. D. Ozment, Associate General Counsel, Litigation and Legislation, Civil Aeronautics Board, with whom John H. Wanner, General Counsel, Joseph B. Goldman, Deputy General Counsel, and Robert L. Toomey, Peter B. Schwarzkopf, Mordecai B. Braunstein, David A. Heymsfeld, and John M. Stuhldreher, Attorneys, Civil Aeronautics Board, were on brief, for respondent.

Francis V. Hanify, Boston, Mass., Edward J. Hickey, Jr., James L. Highsaw, Jr., Washington, D. C., Tyler & Reynolds, Boston, Mass., and Mulholland, Hickey & Lyman, Washington, D. C., on brief of Master Executive Council of Northeast Pilots and International Ass'n of Machinists as amici curiæ.

Joseph P. Rooney, Boston, Mass., William A. Nelson, Miami, Fla., Andrew T. A. Macdonald, Washington, D. C., Gaston, Snow, Motley & Holt, Boston, Mass., and Cross, Murphy & Smith, Washington, D. C., on brief of National Airlines, Inc., as amicus curiæ.

E. Smythe Gambrell, Harold L. Russell, Atlanta, Ga., Robert Proctor, Richard Wait, Boston, Mass., James H. Bratton, Jr., Jackson Cook, Gambrell, Harlan, Russell, Moye & Richardson, Atlanta, Ga., and Choate, Hall & Stewart, Boston, Mass., on brief of Eastern Air Lines, Inc., as amicus curiæ.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

Prior to 1956 Eastern Air Lines, Inc., and National Airlines, Inc., Eastern and

National hereinafter, were established "grandfather" air carriers over the "East Coast-Florida" route and Northeast Airlines, Inc., Northeast hereinafter, had "grandfather" authority over a route system consisting of short-haul segments extending north from New York to Boston and fanning out over New England. It was the smallest of the domestic trunk line air carriers and the only one still receiving federal subsidy. In 1956 in a proceeding involving applications for new and additional air services along the eastern seaboard of the United States from Maine to Florida entitled the New York-Florida Case, 124 C.A.B. 94, the Civil Aeronautics Board, hereinafter the Board, at page 98 stated the issue before it and the majority's decision as follows:

"A principal question in this proceeding is whether the public convenience and necessity require additional air service between the Northeast and Florida, and, if so, the selection of the carrier to provide it. We agree with the examiner's conclusion that an additional service should be authorized from New York to Miami via Philadelphia, Baltimore, Washington, Jacksonville, and Tampa-St. Petersburg/Clearwater ('Tampa'). However, we would select Northeast rather than Delta to provide the service."

In deciding the underlying question of need for additional service over the East Coast-Florida route the Board considered the present and prospective traffic over it, the adequacy of the service provided by Eastern and National, and the Congressional policy embodied in § 2(d) of the Civil Aeronautics Act of 1938, 52 Stat. 973, 980, favoring competition between air carriers to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of foreign and domestic commerce, the Postal Service and the national defense.

The Board first pointed out that the New York-Miami market was the foremost travel market in the country generating about 33 percent more passenger miles than the next largest market, Los Angeles-New York, from almost three times the number of passengers, and that the market had enjoyed outstanding traffic growth in recent years which showed no signs of having reached a plateau. The Board forecast that traffic growth would continue at a high rate in the future and said that "there can be little question that the markets here involved are in material aspects more than comparable to those for which in recent cases we have authorized service by more than two carriers."

The Board next observed that while the service over the route provided by Eastern and National was not inadequate within the meaning of § 404 of the Act, their service did not fully meet the needs of the traveling public. It found that during the peak winter season it was necessary to make New York-Miami reservations 3 or 4 weeks in advance to obtain the service desired, that the carriers' efforts to meet demands for space by too tight scheduling of aircraft had impaired on-time reliability and that Eastern and National had concentrated heavily on the New York-Miami market and had not provided comparable quality or quantity of service to many of the other markets involved. It said: "These factors of passenger inconvenience are at least comparable to those found in recent cases to warrant additional air service."

Finally on this issue the Board turned to the need for additional competition. It noted benefits already conferred by "vigorous competition" between Eastern and National and the promise of future benefits from the same source in the way of elimination of space shortages, but it said that in view of the fact that the needs of the traveling public were not now being fully met "it would not be consistent with our statutory obligations under the Act and the course of our decisions thereunder, to merely maintain the status quo, and rely upon the carriers' assurances as to their willingness and ability to remedy the situation." Observ-

ing that present shortcomings in service had existed over a substantial period of time and that the carriers had not demonstrated their ability to overcome them, the Board pointed to the Congressional policy favoring competition as a stimulus to "vigorous development of our national air route system" and said: "In the present case, we are convinced that a third carrier is required."

The Board divided on the issue of the selection of the carrier to provide the additional service required over the route. Three members of the Board disagreed with the examiner's choice of Delta and selected Northeast. They expressed the belief that extending Northeast's authority to Florida would eliminate its need for subsidy, and they pointed out that Northeast was the smallest of the trunk line carriers, that it had received less in the way of strengthening route awards than any of the original "grandfather" carriers, that all other regional air carriers had "achieved self-sufficiency largely as a result of the Board's policy of authorizing these carriers to expand their services into the long-haul high-density markets," and that this case provided the "last opportunity to accord similar treatment for Northeast."

The Board majority said it had "no doubt" that Northeast could compete "effectively" with Eastern and National, noted that only Northeast could provide one-carrier service from New England points north of Boston to points south of New York, particularly to the nation's capital, and said: "If its prospect for growth in the South is denied in this proceeding, it seems clear that its operations will be frozen in its present pattern, and that it will continue to be a drain on the Federal Treasury. Extended as we propose, it should become a self-sufficient trunk." The majority forecast an increase in northern New England traffic with improved service to that area as a result of one-carrier, one-airport connecting service in New York to points south and expressed the view that Northeast to some extent could integrate its oper-ations in terms of seasonality, not so much in terms of transfer of aircraft from the Florida run in the winter to the New England run in the summer as in avoiding "peaks and valleys" in its personnel needs by using the additional employees needed for the New York-Florida peak season in the winter to meet the demands of the New England peak season in the summer. Expressing confidence in the ability of Northeast's management and the adequacy of its financial backing to effect the radical transformation necessary to convert Northeast from an essentially regional carrier to a trunk line carrier, the majority turned to the impact of added competition upon Eastern and National.

The majority recognized that an award of the run to Northeast would divert "substantial revenues" from Eastern and National. But the majority said that it "may be expected" that Northeast, at least initially, would divert less traffic from the two established carriers than any of the other passenger trunk line applicants for the route and prophesied that "Northeast's diversion will largely come out of future traffic growth in the markets involved." In further elaboration the majority said:

"The record clearly requires the conclusion that, in addition to the high overall traffic growth to be expected along the New York-Florida route, there are long-haul markets, such as New York-Tampa, Philadelphia-Miami, Baltimore-Miami, and Boston-Tampa, which have not as yet received the same measure of service and exploitation as the New York-Miami market, and which might be expected to respond favorably to more vigorous efforts for traffic development. Exploitation of these markets, which is an important byproduct to be expected from the addition of a third carrier to this route, should go far to offset traffic lost to Northeast. We are also in this proceeding granting Eastern and National additional operating

rights which will provide them with additional traffic opportunities and growth." [1]

Turning to the duration of the authorization to be awarded Northeast the Board majority said: "While we have confidence in the undertaking, we recognize that in extending the carrier to Florida, we are in substantial measure changing the character of this carrier's operation. Accordingly, we shall not make the route extension permanent but shall limit its duration to 5 years, after which we can again review the matter and consider further the requirements of the public convenience and necessity."

The two minority members of the Board wholeheartedly agreed with the majority as to the pressing need for a third air carrier on the route. They disagreed, however, as to the majority's selection of Northeast. They thought, although for somewhat different reasons, that Northeast, though willing, was neither fit nor able to render the service needed by the public, that it was not in the best interest of either the traveling public or Northeast for it to undertake the route and that with its inexperience and lack of resources it could not be an effective competitor with the two experienced, well equipped and established carriers already serving the route. They would have selected Delta as the third competitor.

The present proceeding began on April 3, 1961, with an application to the Board by Northeast for amendment of its certificate to delete the expiration date. The Board's examiner found continuing need for three-carrier competition on the route, but reviewing Northeast's experience found it unfit to remain as the third carrier. He did not select the carrier to take Northeast's place.

The Board again divided three to two.

The majority said: "The critical question before us, therefore, is whether un-der the present circumstances, there is a need for a third carrier in the New York-Florida market" and then announced: "We find that no such need exists." Following this the majority noted that the examiner's conclusion that Northeast's authority should not be renewed rested upon his finding that it did not meet the statutory requirement that it be "fit, willing, and able" to provide the additional service he thought the route required, and said: "Upon consideration of the record and the contentions of the parties, we also conclude that Northeast's New York-Florida authority should not be renewed, although our reasons differ from those of the examiner. We find that the public benefits anticipated when Northeast was certified have not materialized, that the future prospects for the operation of Northeast's system on a profitable basis are remote, and that there is no present need for a third carrier in the East Coast-Florida markets." In a footnote appended to the end of the first sentence quoted above the majority said: "Although the examiner's findings on the fitness issue are amply supported by the record in the proceeding, our later findings on other issues are dispositive of the renewal question and make it unnecessary to pass on the technical question of fitness."

In the next eight pages of the decision as reproduced in the petitioner's record appendix the majority recounted in detail Northeast's losses in recent years and its ensuing financial difficulties which it summarized as follows:

"The record, which shows seven years of unprecedented losses, continual financial crises, and deteriorating services in New England, leads us to the conclusion that Northeast cannot achieve self-sufficiency from its Florida routes. Northeast is wholly dependent upon the Florida markets for survival as a long-haul operator. But the carrier lacks the back-up traffic support, the

1. The majority removed restrictions on Eastern's operations north of New York to New England points allowing it to provide "turn around" service between Bos-ton and Washington, and allowed National to extend its route system to Boston and also to several additional southern cities.

strong, seasonally balanced system, and the financial stability which are essential if a carrier is to rely on the Florida vacation markets, with their erratic traffic ups and downs, for the major source of its strength. Past industry experience would indicate that a carrier, with a limited route system and access to traffic confined to multicarrier and unpredictable seasonal markets such as these, cannot operate as economically as those with a more extensive system. Since there are no immediate prospects of any resurgence of Florida traffic growth, we conclude that Northeast cannot achieve self-sufficiency or economic stability. We are, therefore, compelled to find that the renewal of Northeast's Florida authority would be contrary to our obligation to maintain and develop a sound air transportation system."

The majority then mentioned either renewing Northeast's East Coast-Florida route with subsidy for its New England operations or a merger of Northeast with another carrier as possible solutions for its financial and operating problems, but said that "in view of our ultimate finding that there is no need or economic justification for a third carrier on the East Coast-Florida route, it is unnecessary to give further consideration to those two possibilities."

Turning to the growth of the market the majority noted that New York-Miami was no longer the foremost travel market in the country, it having been exceeded by New York-Los Angeles which generated 19 percent more passenger miles, said that the examiner's conclusion that the East Coast-Florida market had made "healthy growth" could not be verified, and noted that with the advent of jet aircraft with higher speed and greater seating capacity coupled with the pressure to use such expensive aircraft to maximum capacity "Eastern and National can, and will, accommodate the Florida traffic now carried by Northeast." The majority then mentioned Eastern's current financial difficulties, which it said no one would suggest stem solely or even in major part from three-carrier competition in its "major source of strength," the East Coast-Florida market, but said: "Since Eastern and National can provide more than adequate service to the public, the opportunity that a two-carrier East Coast-Florida route structure offers for the rehabilitation of Eastern and its return to a sound financial position is a significant factor weighing against the authorization of a third carrier." Summarizing, the majority said:

"The unsuccessful nature of Northeast's operations to date, the lack of any substantial evidence that it will become successful in the future, the failure of the expected East Coast-Florida traffic growth to materialize, the fact that Eastern and National can meet the present needs of the market, and the opportunity afforded us here to aid in the rehabilitation of Eastern, persuade us that the public convenience and necessity do not require the present authorization of a third New York-Florida carrier."

The majority brushed aside the need for three-carrier competition in the East Coast-Florida market, which the Board in 1956 thought the size of the market clearly warranted in view of three and more carrier competition authorized by the Board in smaller markets, with the comment: "The amount of competition that should be authorized in a given market does not turn on the number of carriers the Board may have authorized in some other markets, but depends upon the specific facts and circumstances affecting the markets under consideration. We here find only that a third carrier is not needed at the present time in the East Coast-Florida markets." In the next breath, however, the majority said that Northeast's management had worked "hard and diligently" to develop its Florida route and that the services provided by Northeast on the route had "undoubtedly provided benefits to the traveling

public." Then, noting that Northeast had greatly expanded its organization, the majority recognized that termination of its Florida route would "inevitably have adverse effects on its employees, the New England communities in which those employees reside, its creditors, and its stockholders," but said: "However, as regrettable as the consequences of our action may be, they do not counterbalance the over-all public interest factors which dictate a decision not to renew the temporary authority."

Finally, stating it to be "clear" that the public interest required continuation of the services which only Northeast provided in New England, the majority said it would restore Northeast to subsidy eligibility and that should there be disruptions in Northeast services it would "exercise its full authority to provide and maintain an adequate level of local service" in the New England area. Wherefore the majority held that the public convenience and necessity did not require renewal of Northeast's East Coast-Florida authority.

The two minority members of the Board dissented vigorously. They pointed out that the New York-Miami market was the second largest passenger mile market in the country and the East Coast-Florida run was "among the richest routes in the world generating nearly two million passengers and two billion passenger-miles a year." They found that the market had grown since 1956 and "continues to grow at a healthy pace" and said that they agreed with the Board examiner that: "To set aside a market involving nearly two million annual passengers for two carriers could well be considered a protected market for the few."

The minority posed the issues as: (1) "Do the public convenience and necessity require a third East-Coast Florida carrier?" and (2) "If so, what•carrier

should provide the service?" and said: "The majority equivocates in answering both questions. It finds no need for a third carrier 'at this time' but implies that at some not too distant time a third carrier will be required." Characterizing this finding as "less than satisfactory to the carrier, the parties, civic intervenors and the public" the minority said that the finding is stated "in a rather unique fashion" and continued: "And rather than meet the need issue in terms of public service and the service improvements effected by Northeast, the majority speaks of Northeast's financial difficulties, a subject irrelevant to the issue of need for a third carrier. Although the opinion considers the financial difficulties of Northeast at great length within the framework of the need for a third carrier issue and, in effect, finds Northeast unfit, the majority as a technical matter does not reach that issue. The two issues, public need and selection of carrier, are separate and distinct and must be so treated."

The minority then analyzed traffic data to show a "significant increase" in the number of passengers carried over the route in general, in particular from Boston and Philadelphia on one end, to Tampa/St. Petersburg and Jacksonville on the other, markets "badly neglected by the authorized carriers before the 1956 decision," and expressed the conviction that the record showed traffic enough for a third carrier now and in the future. Turning to the need for three-carrier competition in the market, the minority noted that competitive service was an important statutory objective,[2] expressed the view that the competitive "spur" furnished by Northeast has "substantially" improved service in the market and said: "The conclusion is inescapable that the 1956 competitive authorization is the sole reason the public has been able to enjoy markedly improved service over the East Coast-Florida routes since that

2. The Congressional policy favoring competition between air carriers stated in § 2(d), supra, of the Civil Aeronautics Act of 1938 is restated in § 102(d) of the Federal Aviation Act of 1958, 72 Stat. 731, 740.

time and that the public has no assurance of convenient, adequate service in the future now that a majority of this Board has reversed the unanimous 1956 Board finding that a third carrier is required."

With respect to the qualifications of Northeast as the third competitor the minority said there was no doubt that it was a "willing" carrier, expressed the conviction that it was an "able" carrier and then turned to the question of its "fitness." Carefully analyzing a number of factors on this score the minority pointed out that without curtailing its service Northeast had weathered the expensive transition to jet aircraft at a time when the entire domestic trunk line system was reacting to an economic recession, and that its traffic had continued to grow in spite of its financial straits and "adverse publicity stimulated by its competitors seeking to force Northeast out of the business." In further elaboration the minority continued:

"Among other things, Northeast was forced to curtail nearly all its advertising. Northeast's efforts to obtain further financing during this period met the determined opposition of Eastern and National in moves which were characterized by counsel for the Board and the Department of Justice as 'an attempt to bring about the demise of a competitor' (Brief for Respondent, National Airlines, Inc., v. C. A. B., [113 U.S. App.D.C. 146] 306 F.2d 753 (D.C. Cir. 1962), p. 21 n. 22)

"Finally, Eastern increased its nonstop New York-Miami jet schedules in February, 1962, from 10 to 14 and its capacity by nearly 87 percent over its 1961 capacity. The Examiner correctly found that the effect of 'the addition of the "fighting ships" by Eastern at that particular time was to reduce the load factors of all carriers in the market just prior to the hearing in this proceed-

ing and further to weaken Northeast's position.' "

The minority characterized Northeast's achievements under all the circumstances as "outstanding."

The minority then said that the collapse of Northeast was "virtually dictated" by the cutting off of its one trunk route with consequent detriment to its creditors and stockholders and more particularly with "crippling effect" upon its employees and on the public "in the hard-pressed New England area which is already suffering from a deteriorating railroad transportation system." Liquidation of Northeast was forecast because it could not revert to its *status quo ante* 1956 by reason of the entry of Eastern into the New England area under the 1956 decision and intervening Board action authorizing the entry of new local service carriers into the area. Finally the minority noted the "solicitude for the well-being of Eastern which constitutes such a major factor in the majority decision" but said that although sharing that solicitude: "We cannot accept the dictum that the interest of one airline, important and worthy as it may be, requires the surrender of the lifeline of another." Wherefore the minority concluded that on all of the facts and reasonable inferences therefrom, together with Board precedents and in accordance with statutory policy favoring competition, Northeast's certificate should be renewed on a permanent basis.

On petitions for rehearing both the majority and the minority wrote further opinions, each side adhering to the views it had previously expressed. There is no need to analyze these later decisions in detail. It will suffice to say that the majority again rejected the contention that it was bound by precedent to authorize three-carrier competition in the market involved because it had authorized three or more carrier competition in smaller markets,[3] that the majority said

3. The majority said: "Should our decision here seem to reflect a more re- stricted view of the need for multiple competition than the Board has taken

that its original decision was not "a decision to aid Eastern at the expense of Northeast," and said: "Moreover, as our original opinion shows, our denial was based on the lack of need for a third carrier, and not on the lack of fitness of Northeast or the superior qualifications of another applicant." To this sentence, however, the majority appended the following footnote:

"In this connection it should be noted that Northeast contends that its 'financial experience and expectations' are relevant on the question of carrier selection, but not on the issue of the need for a third carrier. We are unable to agree. In evaluating the need for a third carrier, be it Northeast or some other carrier, it is clearly incumbent on the Board to consider very carefully the financial and other results of Northeast's past operations over the route. Moreover, Northeast's past operations are particularly relevant to the disposition of Northeast's own application. To avoid misunderstanding on this score we find not only that there is no need for a third carrier, but also that irrespective of need for some third carrier the grant of the application of Northeast is not in the public convenience and necessity."

We have analyzed and quoted the opinions below at length, perhaps at too great length, to highlight what we consider vital flaws in the Board's decision. . First and foremost, while we know that the Board refused to extend Northeast's certificate, we cannot be sure of the basis on which the Board rested its refusal. Northeast and the amici supporting its position, the Master Executive Counsel of its pilots and the International Association of Machinists, assert that the Board eliminated Northeast as a competitor in the market solely on the ground

that the market did not require service by three carriers. Counsel for the Board, however, contend that the Board denied Northeast's application not only for lack of need for a third carrier in the market but also, irrespective of need, "on grounds peculiar to Northeast's own application." The amici supporting the Board, National and Eastern, do not agree with Board counsel. In their briefs they concede that actually all the Board decided was that there was no present need for a third carrier in the market, although they emphasize the Board's statement that the examiner's findings of Northeast's unfitness are amply supported by the evidence.

█ There should be no room for this dispute. Courts ought not to have to speculate as to the basis for an administrative agency's conclusion. Indeed, to prevent just such speculation § 8(b) of the Administrative Procedure Act, 5 U.S.C. § 1007(b), provides that all agency decisions shall include not only the appropriate rule, order, sanction, relief or denial thereof, but also findings and conclusions "as well as the reasons or *basis* (emphasis added) therefor, upon all the material issues of fact, law, or discretion presented on the record."

█ However, we are not required to accept Board counsels' *post hoc* argument at face value. Burlington Truck Lines, Inc., v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

It rests primarily upon the last two sentences of the footnote to the Board's opinion on rehearing quoted in full above. Those sentences do indicate that the majority passed on Northeast's fitness ,as well as on the need for a third carrier in the market. But in doing so the sentences contradict repeated categorical assertions in the bodies of both Board opinions that all that was being considered was the need for a third carrier in

in past cases, it nonetheless represents our judgment that under existing conditions as reflected by the facts of record here,

this decision is best calculated to achieve the over-all objectives of the Act."

the market and a categorical assertion in a footnote to the Board's original opinion that it was not passing upon Northeast's fitness. We can hardly believe that the Board would contradict previous clear statements in its opinions and assert an alternative ground for its decision in two sentences of a footnote explaining a collateral point in an opinion denying reconsideration. We agree with Northeast and its amici that lack of need for a third carrier in the market was the sole basis for the Board's conclusion not to extend Northeast's temporary certificate.

Turning to the Board's summary quoted hereinabove it appears that there were five reasons why the Board was persuaded "that the public convenience and necessity do not require the present authorization of a third New York-Florida carrier." The reasons given are: 1) the "unsuccessful nature of Northeast's operations to date," 2) the "lack of any substantial evidence that it will become successful in the future," 3) the "failure of the expected East Coast-Florida traffic growth to materialize," 4) the "fact that Eastern and National can meet the present needs of the market" and 5) the "opportunity afforded us here to aid in the rehabilitation of Eastern."

Once again we are confronted with a needless dispute as to the true import of these findings. Northeast and its amici contend that the Board rested its conclusion upon the sum or totality of its findings so that if any one of them cannot stand the case must go back to the Board as in Carey v. Civil Aeronautics Board, 275 F.2d 518 (C.A. 1, 1960). The Board and its amici on the other hand contend that the findings are alternative so that if any one of them is sound the decision of the Board must be sustained.

In Carey it was clear that the Board reached its conclusion to suspend an air-eral reasons. In this case we cannot man's certificate for the sum total of several say with assurance whether the Board found lack of need for a third carrier in the market for the reasons it gave added together or whether it would have reached its conclusion for any one of the reasons it gave standing alone. Not having made it clear that its reasons were alternative, perhaps we might assume that the reasons are cumulative. At any rate, from the extended discussion of the reasons in its opinions and from the further fact that in its original opinion the Board said that aid to Eastern was a "significant" factor in its decision but downgraded the significance of that factor in its opinion on reconsideration, we must assume that the Board gave at least some weight to each of its reasons, how much, of course, except with respect to aid to Eastern, we cannot tell. Viewed in this light the decision of the Board cannot stand.

The first two reasons given by the Board, the unsuccessful nature of Northeast's operations to date and the lack of prospect for success in the future, are irrelevant to the issue of need for a third carrier on the route unless it is found that Northeast's lack of success and prospect of success are attributable to the inability of the market to support three-carrier competition. But the Board did not make any such finding. On the contrary, it found that Northeast's lack of success was caused by factors peculiar to itself such as lack of back-up traffic support, lack of a seasonably balanced system and lack of the financial stability essential if a carrier is to rely on the Florida vacation markets with their erratic traffic ups and downs.[4]

The third reason given by the Board, failure of traffic growth in the market to materialize, although disputed by the mi-

---

4. Perhaps significantly the majority did not refute the minority's attribution of Northeast's financial difficulties to the cutthroat tactics of its competitors with specific reference to Eastern or to the obvious disadvantages of operating under a temporary certificate.

588

nority, has bearing on the majority's result. It is, however, difficult for us to understand why traffic found sufficient to support three-carrier competition in 1956, which has admittedly grown to some extent since, cannot support three-carrier competition now, and why traffic in the second largest market in the country cannot support three-carrier competition when many smaller markets support the competition of three or more carriers.

The Board's fourth reason, that Eastern and National "can meet the present needs of the market" is adequate as far as it goes, but it does not go far enough. Two needs are involved: the physical need—for seats to carry the traffic and the statutory need for competition as a stimulus to provide good service to the public and to develop a sound air transportation system. The Board's finding covers the first need. No doubt Eastern and National could commit enough equipment to the route and hire sufficient personnel to move the traffic. Perhaps one of them alone could do so. But need for the spur of competition to prod Eastern and National into providing good service to the public, which the Board found necessary in 1956, is put aside with a general conclusion of lack of need for a third carrier in the market and the assertion that the amount of competition in any particular market depends upon the specific facts and circumstances of that market and not upon what the Board might have done at other times with respect to other markets. We agree that the amount of competition required is to be decided by the Board with respect to the specific market involved. And we concede that the Board has wide latitude with respect to the amount of competition needed in any market to meet the statutory requirement. But, particularly in view of the Board's finding in 1956 and the majority's statement in this case that Northeast's advent as a competitor had "undoubtedly provided benefits to the traveling public," we think the Board ought to give reasons for its conclusion differentiating the market involved from many smaller ones and explaining why competition between Eastern and National will meet the statutory requirement now when it did not in the past. We cannot pass upon the legal sufficiency of the bare conclusion that there is no longer any need for three-carrier competition as a stimulant to achievement of the statutory policy.

The fifth reason given by the Board for its conclusion of no present need for a third carrier in the market is the opportunity afforded "to aid in the rehabilitation of Eastern." The Board does not disclose the source of Eastern's financial troubles or give reasons why Eastern should be aided at Northeast's expense. All we know is that the Board did not find that Eastern's need for aid arose from losses resulting from three-carrier competition in the markets involved. It said: "We need not go into the question which was explored at the hearing of whether, under the three-carrier New York-Florida route pattern, Eastern's Florida operations, standing alone, have been profitable; and no one would suggest that Eastern's current difficulties stem solely, or even in major part, from the three-carrier competition in those markets." We do not say that strengthening Eastern is not a legitimate consideration. We do say that good and sufficient reasons ought to be given for robbing Peter to pay Paul.

■ We do not undertake to catalogue all the deficiencies in the Board's decisions. It will suffice to say to bring this opinion to an end that while we know that the Board's ultimate conclusion was to deny extension of Northeast's certificate, we are not sure of the basis on which it rested that conclusion. Moreover, taking at face value the Board's repeated statements that the basis for its conclusion was lack of need for a third carrier in the market, we find the reasons given for that finding either irrelevant or inadequately developed. The case must go back to the Board for further study followed by an explicit state-

ment of the issue or issues actually decided and a statement of relevant bases for its decision supported by intelligible findings of fact. "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." Secretary of Agriculture v. United States, 347 U.S. 645, 654, 74 S.Ct. 826, 832, 98 L.Ed. 1015 (1954), citing United States v. Chicago, M., St. P. & P. R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). When we know what the Board decided and why, the time will be ripe to consider the legal sufficiency of the evidence to support the Board's findings. In the meantime we shall retain our jurisdiction.

Decree will be entered setting the orders of the Board aside and directing it to take further proceedings not inconsistent with this opinion.

ALDRICH, Circuit Judge (concurring).

I share in the court's criticism of the Board's failure to express itself adequately, and concur in the court's ultimate conclusion, but I take a somewhat different approach. It seems to me, too, with all deference to the Board, that the deficiencies in its opinion, particularly in the light cast by the minority opinion which not only invited a better answer, but should have dictated it, indicate lack of developed thought. In a case as important as this the greatest attention should have been given to a careful denomination of the issues, an analysis of the underlying relevant considerations (with a corresponding exclusion of the irrelevant ones) and a reasoned conclusion. The more I review the Board's opinion, the more I believe that it justifies the minority's charge of equivocation. However, I disagree with my brethren that lack of need for a third carrier was the sole basis for the Board's conclusion not to extend Northeast's certificate. To me it seems that in the last sentence of

the quoted footnote in its opinion denying rehearing the Board stated sufficiently explicitly, as an alternative ground, not that Northeast was unfit, but that the selection of Northeast would not be in the public interest. But the announcement of that ground in such a manner, with no seeming recognition that it was a complete contradiction of the apparent tenor of, and, indeed, express statements in, its opinion, is an example of administrative fiat, which, frankly, shocks me. Even if I am correct in thinking that the court erred in discounting this as a basis for the Board's decision, I would quite agree that as attempted patchwork afterthought [1] it is unworthy of present attention.

Turning to the Board's denominated "ultimate finding" that three carriers are not needed on this route, the first question is whether this represents a fundamental change in policy, and means that the Board proposes to reduce its emphasis on competition. The Board is free, of course, to make changes in policy, but the seriousness of this one, if that is what it is, would call not only for deep and mature thought, but for the assembly of the most cogent reasons. In the Board's opinion I find neither. If, on the other hand, the opinion is viewed as limited to a single case it seems no more illuminating. Faced with a consistent practice of authorizing three or more carriers on less demanding routes, the Board emphasizes that this one has not increased to the degree expected. This scarcely serves to answer the fact that it is still one of the world's richest and heaviest. Nor is it an answer that the remaining carriers are physically capable of handling the traffic. Presumably two carriers, or even one, could be capable of handling all the traffic anywhere. In so reasoning I agree with the court that the Board has said nothing.

The only matter I find of special moment is the Board's discussion of North-

---

1. That it was an afterthought seems candidly admitted by the Board's use of the present tense "we find." It was not too late to rewrite its opinion, but that is not what the Board did. See, e. g., fn. 2, infra.

east's lack of financial success. If the Board had considered this on the issue of Northeast's fitness, it would have been undoubtedly relevant. (So, also, would a number of other factors which the Board did not consider, and justifiably, in the light of its disclaimer.) As a demonstration that this route cannot support three carriers, it is unimpressive. The Board adopted the examiner's finding that "[p]erhaps no other carrier in the history of the industry has been plagued with more adverse circumstances in its operations than Northeast * * *." Northeast's peculiar vicissitudes in no way indicate that this highly travelled route cannot support three carriers. Significantly the Board, for all its attempt to avoid the implication of its 1956 decision by outlining Northeast's failure to become self-sufficient, does not criticize the examiner's finding of economic capacity of the route. All of its discussion of Northeast's financial difficulties comes to naught in the course of its opinion, because instead of facing up to what should be the consequences, so far as Northeast is concerned, the Board says it is "unnecessary" to do so "in view of our ultimate finding that there is no need or economic justification for a third carrier." [2]

The Board's reason that Eastern needs strengthening, calls for no further comment. However, I think there is one important consideration which has not been dealt with in the court's opinion. It is true that Northeast had only a temporary certificate. To an extent it obviously took its chances, not only with respect to the inherent financial difficulties of operating under a temporary certificate referred to in the court's opinion, but to what would be the circumstances at the time of renewal. But if anything seems clear in this case, it is that the rea-

son that Northeast's certificate was originally made temporary was the question in the minds of the then minority members of the Board of its ability to compete. The Board is not estopped from changing its views. At the same time I feel there should be some recognition of the fact that the single, express burden which it placed upon Northeast in 1956 was to demonstrate an ability as a competitive trunkline carrier, an undertaking which, at least as of the moment, we must take as accomplished. Certainly from the standpoint of national policy the present decision of the Board, if affirmed, will exist as a serious warning to anyone contemplating accepting a temporary certificate. What the Board has done was to find in 1956 that, because of the deficiencies of the then two carriers, additional competition would be to the public benefit; then, when these benefits have been, concededly, conferred at the cost of a necessarily enormous commitment, the Board's response is that you satisfied our doubts about your ability to compete and you accomplished much of what was wanted, but now we find that three carriers are not needed after all. Not only has the Board done this, but, as the court has pointed out, it has left Northeast in a worse position competitively than before, because to compensate Eastern and National for Northeast's intrusion into their area it allowed them to extend into Northeast's. I agree that it would overdignify Northeast's status to say that it is entitled to "security of route," but in this overall situation I would have thought the Board would have recognized a special burden to justify non-renewal of Northeast's certificate on the particular ground that its competition was not required. If it did feel that burden it has given no indication of it beyond an expression of regret.[3]

2. On that broad basis it was, of course, unnecessary. But, correspondingly, it should have become necessary when the Board adopted its new position expressed in its final footnote.

3. The Board's brief is equally unsatisfying. Stating that this is "not the first time"

that the Board has denied renewal applications because of a carrier's "inability to conduct profitable operations," it cites two cases, in both of which the ground for refusal was that the route itself was uneconomical and did not warrant a subsidy. That counsel should be reduced to such citations speaks for itself.