**WAIT RADIO, a Co-partnership,
Appellant,**

v.

**FEDERAL COMMUNICATIONS COM-
MISSION, Appellee,**

Carter Publications, Inc., Clear Channel Broadcasting Service, A. H. Belo Corporation, Midwest Radio-Television, Inc., Intervenors.

**No. 21689.**

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 13, 1968.

Decided June 24, 1969.

Danaher, Circuit Judge, dissented.

**1154**

Mr. Arthur J. Goldberg, Washington, D. C., for appellant. Mr. Robert M. Lichtman, Washington, D. C., also entered an appearance for appellant.

Mr. Stuart F. Feldstein, Counsel, Federal Communications Commission, with whom Messrs. Henry Geller, General Counsel, and John H. Conlin, Associate General Counsel, Federal Communications Commission, were on the brief, for appellee. Mrs. Lenore G. Ehrig and Mr. Joseph A. Marino, Counsel, Federal Communications Commission, also entered appearances for appellee.

Messrs. Theodore Baron and Michael Finkelstein, Washington, D. C., were on the brief for intervenor, Carter Publications, Inc.

Messrs. Peter Shuebruk, Herbert M. Schulkind and Howard Jay Braun, Washington, D. C., were on the brief for intervenor, Midwest Radio-Television, Inc.

Mr. R. Russell Eagan, Washington, D. C., entered an appearance for intervenor, Clear Channel Broadcasting Service.

Messrs. William J. Dempsey, and William C. Koplovitz, Washington, D. C., entered appearances for intervenor, A. H. Belo Corporation.

Before DANAHER,* LEVENTHAL and ROBINSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

WAIT Radio brings this appeal to protest a decision by the Federal Communications Commission rejecting as unacceptable its application for authority to operate its station on an unlimited time basis.[1] We think the Commission erred by not giving adequate reasons for denying and refusing to hold a hearing on appellant's request for waiver of certain FCC rules and we remand for further consideration.

**I**

WAIT operates a Chicago AM radio station on a frequency of 820 kHz, one of the so-called clear channels. Under FCC "clear channel" rules certain AM frequencies are designated as clear channels that can be used at night only by specified stations that broadcast a signal to "white areas," sparsely populated regions that have no local radio service.[2] Because of the "skywave contour" characteristics of nighttime radio signals, other stations broadcasting on a "clear channel" frequency must close down at night to avoid interference in "white" area reception with those stations particularly authorized to transmit this special nighttime signal. As a result, WAIT operates on a sunrise to sunset basis.

WAIT filed an application requesting a waiver of the clear channel rules. Its proposal included plans for constructing a directionalized antenna that would

---

\* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.

1. WAIT Radio brings this appeal pursuant to 47 U.S.C. § 402 (1964).

2. The pertinent rules are found in 47 C.F.R. §§ 73.21, 73.25, 73.182(a) (1) (i), and 73.182(w) (1968). While § 73.24, 47 C.F.R. § 73.24 (1968), is also involved, it would seem that in the context of this application for waiver, it adds nothing, a point to which we will return.
 During the nighttime hours the normal radio signal will travel in what the trade calls a "skywave contour." The effective broadcast radius of the signal projects into remote regions that cannot pick up the signal during daylight hours. The clear channel policy attempts to capitalize on this engineering phenomenon by utilizing the skywave contour of strategically located stations to service remote and sparsely populated regions of the country, so-called "white areas," where no local stations exist to serve the area with the so-called "primary" radio signal that we are accustomed to tuning in on our receivers. Under Commission rules the clear channel frequencies are to be free from interference of signals from other stations.

beam its signal away from "white" areas that were being served by stations WBAP and WFAA, licensed to operate clear channels kHz out of Fort Worth/Dallas, Texas. WAIT's application asserted that by confining its signal, its skywave beam would not interfere with the serviceable contour of the signal from the Texas stations except in regions that receive primary groundwave service from at least one other station,[3] and its ostensible violation of Commission rules would not conflict with the policy underlying the "clear channel" rules.

In support of its waiver request WAIT further alleged that its programming of "good" music and forum discussions on matters of public interest is a unique AM service in the Chicago area. Appended to the application were supporting data, of surveys, etc., indicating listener preference for such programming. The application further alleged that the present fluctuating broadcast schedule, depend-

ent on the actual time of sunrise and sunset, and no evening service, is a disadvantage. WAIT makes particular reference to its distinctive adult audience, able during the evening hours to listen to, and understand, serious social, political and educational programs, and it claims that the limitation on its channel is a limitation on communication of ideas.[4]

The Commission rejected WAIT's request in an opinion and order of October 25, 1967, and ordered that the application be returned as unacceptable. WAIT appeals from this decision and order and the Commission's subsequent denial of its petition for reconsideration.

II

Able arguments have been presented on both sides. Appellant stresses to us, as it did in memoranda to the Commission, that First Amendment considerations permeate the field of public broadcasting. First Amendment principles,

---

3. WAIT appended to its application detailed engineering data and a map explaining and demonstrating the range of its proposed directionalized signal. *Compare* Rio Grande Radio Fellowship Inc. v. FCC, 132 U.S.App.D.C. 128, 406 F.2d 664 (1968). The application assumed, based on "engineering convention" that any interference beyond the "0.5 mv/m 50%" intensity of the Texas signal was not contrary to clear channel policy. In brief appellant has explained the "0.5 mv/m 50%" designation as being the outer serviceable range of a skywave broadcast signal. Under normal conditions it seems that beyond that range a listener will miss about 50% of the broadcast. The Commission's opinion and order does not dispute WAIT's assertion that the "0.5 mv/m 50%" range delineates the serviceable nighttime signal. Should plans to increase the power on these stations go into effect, it does appear, as noted by intervenors, that WAIT's new service might cause interference in some areas within a "0.5 mv/m 50%" contour. The Commission's opinion, however, does not in any way rely on this fact in rejecting WAIT's application, and the application itself, envisioning such a development, seeks the new authorization subject to a change in Commission policy on broadcast power of existing clear channel stations.

A variant contention put forth by the intervening Texas stations was that interference with their signal, even beyond the "0.5 mv/m 50%" contour, runs afoul of the clear channel policy. The Commission did not rule on this contention. In its Petition for Reconsideration WAIT points out that the programming of the Texas stations does not constitute meaningful service to the non-white area market within the "0.5 mv/m 50%" contour of the Texas stations. This, according to WAIT, is also true of areas beyond the protected contour where the primary service is not only superior to the weak and intermittent reception from the Texas station, but also carries programs of greater interest and relevance to the audiences which are quite remote from the Texas area. Detailed lists were attached to the Petition identifying the cities and areas where WAIT's signal might interfere with that of the Texas stations and also identifying the available alternative services.

4. The issue may be said to be whether the public interest requires limitation of the freedom of the listening public at home. *Compare* Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

WAIT says, mean that the Commission's conceded power to license and regulate in the "public interest" must be exercised with circumspection, that the rules must be drawn as narrowly as possible so as to give the widest possible play to freedom of expression. It is contended that the Commission's failure to waive its clear channel rules, where this underlying policy will not be infringed, is contrary to the First Amendment's policy of freedom of expression.

The Commission in effect replies to the First Amendment issue by invoking National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), and other decisions affirming the power to regulate the use of broadcast facilities.

■■ At this juncture, we do not rule on appellant's contentions, which go to the impact of the First Amendment on the substantive content of broadcast regulations. When an application pleads, and offers factual material in support of, a non-frivolous First Amendment contention, an agency may not dismiss it with the routine treatment that might suffice in the ordinary case. We hold that the Commission must state its basis for decision with greater care and clarity than was manifested in its disposition of WAIT's claims, and remand for a clearer statement of reasons.

1. Two strands of doctrine apply to the judicial review of administrative de-

terminations. First is the principle that an agency or commission must articulate with clarity and precision its findings and the reasons for its decisions. The importance of this requirement is inherent in the doctrine of judicial review which places only limited discretion in the reviewing court. As Justice Harlan recently said in the Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968):

> The court's responsibility is not to supplant [a] Commission's balance of * * * competing interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors. Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry.[5]

Of course busy agency staffs are not expected to dot "i's" and cross "t's." Our decisions recognize the presumption of regularity.[6] We adhere to "salutary principles of judicial restraint."[7] Courts are indulgent toward administrative action to the extent of affirming an order where the agency's path can be "discerned" even if the opinion "leaves much to be desired."[8]

**5.** *See also* NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 442–443, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); SEC v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947); Radio Station KFH Co. v. FCC, 101 U.S.App.D.C. 164, 247 F.2d 570 (1957); Northeast Airlines, Inc. v. CAB, 331 F.2d 579, 586–589 (1st Cir. 1964); Jaffe, Judicial Control of Administrative Action (1965).

**6.** *See* Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 406, 379 F.2d 453, 460 (1967), where we said "A strong presumption of regularity supports the

inference that when administrative officials purport to decide weighty issues within their domain they have conscientiously considered the issues and adverted to the views of their colleagues."

**7.** *See id.* at 409, 379 F.2d at 463, alluding to "salutary principles of judicial restraint."

**8.** *See* Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945); Pikes Peak Broadcasting Co. v. FCC, D.C.Cir. No. 22023, March 24, 1969, slip op. at 18, where we concluded we were "satisfied that the Commission gave * * * a hard look."

2. The tension between these principles is heightened when a court undertakes to review administrative action on an application for waiver. Presumptions of regularity apply with special vigor when a Commission acts in reliance on an established and tested agency rule. An applicant for waiver faces a high hurdle even at the starting gate. "When an applicant seeks a waiver of a rule, it must plead with particularity the facts and circumstances which warrant such action." Rio Grande Family Radio Fellowship, Inc. v. FCC, *supra* note 3. Yet an application for waiver has an appropriate place in the discharge by an administrative agency of its assigned responsibilities. The agency's discretion to proceed in difficult areas through general rules is intimately linked to the existence of a safety valve procedure for consideration of an application for exemption based on special circumstances. Permian Basin Area Rate Cases, *supra*; FPC v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L. Ed.2d 112 (1964); United States v. Storer Broadcasting Co., 351 U.S. 192 at 204–205, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997 (1943); American Airlines v. CAB, 123 U.S.App. D.C. 310, 359 F.2d 624 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L. Ed.2d 75 (1966); Pikes Peak Broadcasting v. FCC, supra note 8; WBEN, Inc. v. United States, 396 F.2d 601, 618 (2d Cir. 1968), cert. denied, 393 U.S. 914, 89 S.Ct. 240, 21 L.Ed.2d 200 (1968).

 The salutary presumptions do not obviate the need for serious consideration of meritorious applications for waiver, and a system where regulations are maintained inflexibly without any procedure for waiver poses legal difficulties. The Commission is charged with administration in the "public interest." That an agency may discharge its responsibilities by promulgating rules of general application which, in the overall perspective, establish the "public interest" for a broad range of situations, does not relieve it of an obligation to seek out the "public interest" in particular, individualized cases. A general rule implies that a commission need not re-study the entire problem de novo and reconsider policy every time it receives an application for waiver of the rule. On the other hand, a general rule, deemed valid because its overall objectives are in the public interest, may not be in the "public interest" if extended to an applicant who proposes a new service that will not undermine the policy, served by the rule, that has been adjudged in the public interest. An agency need not sift pleadings and documents to identify such applications, but allegations such as those made by petitioners, stated with clarity and accompanied by supporting data, are not subject to perfunctory treatment, but must be given a "hard look." [9]

 3. These principles are not easily reduced to a quantifiable formula for deciding when an agency disposing of a waiver application has crossed the line from the tolerably terse to the intolerably mute. There are strong indications that the boundary has been transgressed in the case before us. The Commission's order suggested, and perhaps even required, that WAIT's waiver application may not be entertained because it failed to proceed broadside against the clear channel policy.[10] The Commission's view that WAIT's request for waiver must fall

9. *See* Pikes Peak Broadcasting v. FCC, *supra* note 8.

The agency is not bound to process in depth what are only generalized pleas, a requirement that would condemn it to divert resources of time and personnel to hollow claims. The applicant for waiver must articulate a specific pleading, and adduce concrete support, preferably documentary. Even when an application complies with these rigorous requirements, the agency is not required to author an essay for the disposition of each application. It suffices, in the usual case, that we can discern the "why and wherefore." *See* Rio Grande Radio Family Fellowship, Inc. v. FCC, *supra* note 3.

10. *See* ¶ 6 of the Commission's opinion, set forth at note 12, *infra*.

in the absence of an attack on the general rule is underscored by its disposition of appellant's petition for reconsideration.[11] This approach is without merit. The very essence of waiver is the assumed validity of the general rule, and also the applicant's violation unless waiver is granted. And as already noted, provision for waiver may have a pivotal importance in sustaining the system of administration by general rule.

 The somewhat perfunctory treatment in the Commission's opinion is capped by the startling statement in paragraph 6 that the application is subject to dismissal out of hand because it revealed that in the absence of waiver there would be a violation of the Commission's rules.[12]

It may be that points raised on appeal by Commission counsel would support its order if they had been set forth by the agency, but argument by counsel cannot take the place of an agency's statement of reasons or findings.[13] Those points noted by counsel which do appear in the opinion are set forth merely as contentions of opponents not as reasons of the Commission.[14] Nor are the difficulties obviated by the opinion denying reconsideration, which purports to be only a restatement of the original opinion. That opinion reiterates that the circumstances showed an operation in violation of rules, a point we take as a tautology inevitable in an application for waiver, but which the Commission mistakenly takes as a reason for denial.

11. The Commission made a point of noting in its denial of reconsideration that "WAIT had not attacked the Commission's Clear Channel policy or urged revision of these rules. * * *"

12. The Commission said (¶ 6):
On the basis of appellant's statement that it does not attack the Clear Channel doctrine or policy of the Commission or urge reconsideration or revision of the Clear Channel rules, it is difficult to perceive a possible legal basis for the requested action in view of the clear and acknowledged violations of Sections 73.21, 73.25 and 73.182 of the Rules, which establish the so-called Clear Channels and the technical specifications for their use.

It is manifest error to deny a waiver on the ground that there would be a violation in the absence of the waiver sought. The error is not retrieved by ¶ 7. Its bare statement that the application does not present a sufficient basis for waiver is a conclusion, not a reason. And paragraph 7 also reflects the view that overbreadth does not provide a possible legal basis for granting a waiver.
Compare West-Michigan Telecasters, Inc. v. FCC, 130 U.S.App.D.C. 39, 396 F.2d 688 (1968).

13. See NLRB v. Metropolitan Life Ins. Co., supra note 5; Burlington Truck Lines, Inc. v. United States, supra note 5; West-Michigan Telecasters, Inc. v. FCC, supra note 12; Braniff Airways, Inc. v. CAB, supra note 6. Counsel argued that allocation of 820 kHz to WAIT would be an inefficient use of the wave lengths. A directionalized transmitter would fail to serve 30% of the population and 80% of the area within WAIT's normally protected contour. Counsel also noted that stations in other areas might provide an additional primary service in a non-white area and also further Clear Channel policies if 820 kHz were in fact to be duplicated. It was further argued that the secondary service to areas receiving primary service on one or two frequencies is relevant to the decision of whether waiver should be granted.

14. The opinion also notes the proposals pending before the Commission to authorize high-power transmitters which would increase the effective radius of the sky-wave signal. Such increase in signal strength would result in interference over "white" areas by WAIT's signal. The Commission also stated without elaboration the contention by intervenors, and urged by counsel on appeal, that the additional skywave service in areas with limited primary service is relevant to the decision to grant a waiver. See note 3, supra. Compare Permian Area Basin Rate Cases, supra, 390 U.S. at 804, 88 S.Ct. 1344.
We need not here decide whether the FCC could decline WAIT's request on the ground that a temporary waiver would be an unacceptable administrative burden, or would generate a sense of vested interest or related pressures interfering with future flexibility in the administrative process.

This is not the kind of case in which the court may be asked to "cut and sew the meager materials at hand into the pattern which we guess the Commission had in mind."[15] A willingness to undertake minor alterations on an opinion already made is not an undertaking to custom tailor a new one.

4. The court's insistence on the agency's observance of its obligation to give meaningful consideration to waiver applications emphatically does not contemplate that an agency must or should tolerate evisceration of a rule by waivers. On the contrary a rule is more likely to be undercut if it does not in some way take into account considerations of hardship, equity, or more effective implementation of overall policy, considerations that an agency cannot realistically ignore, at least on a continuing basis. The limited safety valve permits a more rigorous adherence to an effective regulation.[16]

Sound administrative procedure contemplates waivers, or exceptions granted only pursuant to a relevant standard— expressed at least in decisions accompanied by published opinions, especially during a period when an approach is in formation, but best expressed in a rule that obviates discriminatory approaches.[17] The agency may not act out of unbridled discretion or whim in granting waivers any more than in any other aspect of its regulatory function. The process viewed as a whole leads to a general rule, and limited waivers or exceptions granted pursuant to an appropriate general standard. This combination of a general rule and limitations is the very stuff of the rule of law, and with diligent effort and attention to essentials administrative agencies may maintain the fundamentals of principled regulation without sacrifice of administrative flexibility and feasibility.

▆ 5. We have identified deficiencies in the FCC's opinion rejecting the application for waiver. We have examined the significance of the waiver procedure and pointed out that it is not necessarily a step-child, but may be an important member of the family of administrative procedures, one that helps the family stay together. These suffice for the case at hand, and we have no occasion to consider to what extent the overbreadth principle of First Amendment cases narrows the range of administrative discretion consistent with the general standard of "public interest" and places a special burden on the Federal Communications Commission not to maintain its general rules in an instance or class of instances not strictly furthering the policy of the regulation.[18] That the Commission's statutory assignment pertains to an industry concerned with basic freedoms of expression does not subject it to unmanageable standards, either as to substantive powers or procedures. But the manifest importance of subject-matter means that the Commission is not lightly to be indulged with dispensations from legal requirements.[19]

15. *See* the concurring remarks of Mr. Justice Douglas in ICC v. Columbus & Greenville Ry., 319 U.S. 551, at 559, 63 S.Ct. 1209, at 1213, 87 L.Ed. 1580 (1943).

16. *See* Leventhal, Reviewing the Permian Basin Area Gas Price Hearings, Public Utilities Fortnightly (March 12, 1964). *Compare* Permian Area Basin Rate Cases, *supra*, 390 U.S. at 822, 88 S.Ct. 1344.

17. City of Chicago v. FPC, 128 U.S.App. D.C. 107, 385 F.2d 629 (1968); cert. denied, Public Service Commission of Wisconsin v. F. P. C., 390 U.S. 945, 88 S.Ct. 1028, 19 L.Ed.2d 1133 (1968).

18. *Compare, e. g.*, Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Bates v. Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). Schneider v. State of N. J., Town of Irvington, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

19. *See* Joseph v. FCC, 131 U.S.App.D.C. 207, 404 F.2d 207, 212 (1968); *compare* Northern Nat. Gas Co. v. FPC, 130 U.S. App.D.C. 220, 399 F.2d 953 (1968); *see also* Berko v. SEC, 297 F.2d 116, 118 (2d Cir. 1961).

We think the pleading filed by WAIT, supported by data sufficient to overcome the initial hurdle, was entitled to reflective consideration. On balance we conclude the Commission's treatment, with its "combination of danger signals,"[20] belies the "hard look" the application merited.[21] We do not rule on substantive contentions, but remand for further consideration.

So ordered.

DANAHER, Circuit Judge (dissenting):

When reduced to its bare bones, this appeal presents only a claim that these appellants are entitled as a matter of law to an additional primary nighttime radio service to reach some 7 million people in the Chicago area. They even ask this court to direct that their "application be accepted for filing and that upon acceptance the application be granted." In those very words, their brief so concludes.

Never mind the Commission's Clear Channel doctrine or its policy; forget that the proposal patently violates the spirit and the letter of the provisions primarily of section 73.24(b) (3), and of other Rules in lesser degree; appellants want a larger audience; they wish to provide the Chicago area with a type of programming which they blandly say the listening audience should have. If their application be not granted, First Amendment rights will be flouted, they argue. Such is the posture of the case as submitted to the Commission and now to this court.

My colleagues remand, calling upon the Commission to articulate its reasons for refusing to grant a waiver of its long-standing Rules. It seems to me fundamental that the burden of making an adequate showing as to any such claimed entitlement rested upon the appellants. On the face of their application when read with their engineering exhibit against the Commission's standards, they wholly failed to sustain that burden, and the Commission so perceived.

Their application before the Commission disclosed that they would subject to interference an area of some 70,700 square miles and a population of some 2,165,502. Mr. Maurice Rosenfield, Managing Partner and Executive Director, represented that the appellants, including their counsel, not only were aware of legislative and administrative action but that through staff conferences and written directions and memoranda, the Station's employees and agents are kept informed of requirements. Thus the partners knew when they acquired the station in 1962 that they were permitted to operate, *daytime only,* on 820 kc. They were aware, of course, that they were to be "silenced" at night, although they now complain that they are being "silenced" by the Commission's action here challenged. They knew all along that the channel was one of the Class I unduplicated clear channels, reserved for the exclusive use of one station during nighttime hours, and entitled to protection from co-channel interference. Even so, in the instant proceeding, the appellants did not attack the clear

---

**20.** *See* Joseph v. FCC, *supra*, 131 U.S. App.D.C. at 212, 404 F.2d at 212.

**21.** *Compare* Pike's Peak Broadcasting Co. v. FCC, *supra* note 8, where we noted that a commission's order would be sustained where the agency took "a hard look" at petitioner's contentions even though "the standard [applied] would perhaps have become sharper had the Commission focused upon clearer rebuttal of petitioner's central allegations." Slip op. at 17.

The Commission's conclusory reasoning and mechanical reliance upon National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997 (1943), do not resolve appellant's contentions. WAIT, by seeking waiver, challenged neither the Commission's power to regulate, nor the validity of the general application of the clear channel rules. The issue is whether the Commission may curtail access to broadcast facilities by those applicants who, although technically in violation of a Commission rule, will not be undermining the purpose or policy which the rule was designed to further.

channel policy. They did not seek revision of the Commission's Rules. They simply said that despite the Rules, they are entitled to a nighttime audience in the city of Chicago, notwithstanding that their own application showed that the area "is served by more than twenty-five AM stations and sixteen FM stations."

Since their application said that they keep abreast of pertinent legislative and administrative actions, the appellants knew that the Commission's 1961 Report and Order in its Docket 6741 provided that 820 kc is one of 12 clear channels, not to be duplicated at night, and already reserved for expansion of "white area" service. In like manner, the appellants must have been aware of the Commission's 1962 Memorandum and Order which provided that the same clear channel, on 820 kc, was to be retained, subject to exploitation through the possible use of higher power.

Above all—indeed, without more—the application was defective as the appellants conceded, and accordingly the Commission noted, "that the proposal would cause interference as defined by section 73.24(b) (3)." [1]

Obviously, the Commission could see right on the face of the application with its attached engineering exhibit that WAIT could not meet the established requirements. The Commission itself from its records and from its own engineering certainly knew what the appellants knew. Not only can it be seen from the text of the Commission's original Memorandum

Opinion and Order that consideration had been given to the showing submitted by the appellants, but notice was taken of its lack of showing. The appellants' pleadings and exhibits had received a "hard look," I suggest. The appellants simply could not comply with the requirements, and the Commission in footnote 1 of its Memorandum Opinion and Order made specific reference to the appellants' engineering exhibit, there pointing out:

> [T]he proposal would cause prohibited interference to an area approximately 850 miles long and 150 miles deep at its center, or what the appellant describes as "a territorial crescent 100% served via groundwave from local stations." Also, the proposal would not satisfy the "25% white area" requirements of this section.

So it was that the Commission concluded based upon its knowledge of the problem, its expertise in the field, the pleadings submitted, and as noted in paragraphs 6 and 7 of its Memorandum Opinion and Order, that the appellants had failed to present facts which would justify their request for waiver. So it was that the appellants' application was returned "as unacceptable for filing."

The Commission's action finds support in our cases,[2] and in the rulings [3] of the Supreme Court.

I would accept the record just as did the Commission and make my assessment particularly in light of the Commission's

---

1. That section provides in pertinent part that authorization for increase in the facilities of an existing station will be issued only after a satisfactory showing has been made

 "That a proposed new nighttime operation * * * would (i) not cause objectionable interference to any existing station * * * and (ii) provide a first primary AM service to at least 25 per cent of the area within the proposed interference free nighttime service area."

 Oddly enough, their opening brief here made no mention whatever of this threshold rule, and in their reply brief they

rested solely on their "constitutional argument."

2. Carter Mountain Transmission Corporation v. FCC, 116 U.S.App.D.C. 93, 98, 321 F.2d 359, 364, cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963) ; Interstate Broadcasting Co. v. FCC, 105 U.S.App.D.C. 224, 228, 231, 265 F.2d 598, 602, 605 (1959). *Cf.* Transcontinent Television Corporation v. FCC, 113 U.S. App.D.C. 384, 389, 308 F.2d 339, 344 (1962).

3. Nat. Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

**1162**

expertise,[4] here called for in singular degree. Finding that the appellants had wholly failed to justify their requested waiver, I would suppose there was no alternative to a return of the application. As for the First Amendment contention, I would certainly agree that the right of free speech does not include the right to use the facilities of radio without a license and, assuredly, unless a construction permit were to be authorized in accordance with Commission rules, there could be no license. I see here no denial of free speech.

I will let Mr. Justice Frankfurter speak[5] for me, thus:

> We come, finally, to an appeal to the First Amendment. The Regulations, even if valid in all other respects, must fall because they abridge, say the appellants, their right of free speech. If that be so, it would follow that every person whose application for a license to operate a station is denied by the Commission is thereby denied his constitutional right of free speech. Freedom of utterance is abridged to many who wish to use the limited facilities of radio. Unlike other modes of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation. Because it cannot be used by all, some who wish to use it must be denied. But Congress did not authorize the Commission to choose among applicants upon the basis of their political, economic or social views, or upon any other capricious basis. If it did, or if the Commission by these Regulations proposed a choice among applicants upon some such basis, the issue before us would be wholly different.[6]

I oppose the remand. I would affirm the Commission.

4. See cases cited in notes 2 and 3 *supra*. Especially take note of the Commission's policy and the findings exemplified in the 1961 and 1962 orders relating to the clear channel program, text *supra*, which would here be reduced to sheer vacuity.

5. Nat. Broadcasting Co. v. United States, *supra* note 3, 319 U.S. at 226, 63 S.Ct. at 1014.

6. *Cf.* Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).