PILLARD, Circuit Judge,
dissenting:
The court holds that the FCC’s requirement of opt-out notices on fax ads contravenes the plain text of the statute. The majority shortchanges the FCC’s statutory authority to “implement” Congress’s ban on “unsolicited” fax ads — those sent without “prior express invitation or permission, in writing or otherwise.” 47 U.S.C. § 227(b)(2), (b)(1)(C), (a)(5). The FCC reasonably concluded that opt-out notices are needed on all fax ads so that recipients can easily limit or withdraw their “invitation or permission.” Regulation of “unsolicited” advertising requires a mechanism for discerning whether someone who okayed fax ads at some point in the past is still willing to receive an advertiser’s further faxes. The likely result of the court’s decision is to make it harder for recipients to control what comes out of their fax machines (and so perhaps more hesitant to acquiesce to receive fax ads in the first place) — precisely the sort of anti-consumer harm Congress intended to prevent.
I.
The majority fails to see the FCC’s rationale for requiring that all fax ads include an informative opt-out notice. See Maj. Op. at 1082-83. Anybody who has ever shared contact information and then suffered a fusillade of annoying and unstoppable advertisements — whether by phone, text, email, or fax — recognizes the nature of the problem the FCC was trying to address. Testing the water is no commitment to an endless swim; it is a reasonable protection of the hesitant swimmer to prohibit hiding the life jackets.
The FCC was authorized to give such protection. Congress directed the FCC to “prescribe regulations to implement” the prohibition on the sending of fax ads absent the recipient’s “prior express invitation or permission.” 47 U.S.C. § 227(b)(2), (a)(5). Beyond clarifying that the permission need not be in writing, Congress said nothing about how “prior express invitation or permission” might be elicited, or when it might lapse or be withdrawn. Does an advertiser need to secure permission before sending each fax ad to a particular recipient? Would permission, once given, last forever? Or must an advertiser provide a spectrum of more nuanced options between those poles? The statute does not say, and the FCC reasonably determined that, in part to guard against error or *1084 fraud in identifying who has in fact agreed to accept fax ads, permission would last only “until the consumer revokes such permission by sending an opt-out request to the sender.” 21 F.C.C. Red. 3787, 3812 (2006).
So far so good; that reasonable statutory interpretation has not been challenged. But this right to opt-out raised a further question: If, for permission to be meaningful, recipients must be able to limit or withdraw it, do advertisers need to make clear how that may be done? The FCC concluded that they do. Requiring all fax ads to include information about opting out would “allow consumers to stop unwanted faxes in the future.” 21 F.C.C. Rcd. at 3812. As the FCC further explained in the order under review, the failure to provide opt-out notices could confront fax recipients “with a practical inability to make senders aware that their consent is revoked.” 29 F.C.C. Red. 13998, 14007 (2014). Indeed, the inclusion of an opt-out notice is part of what makes subsequent faxes “solicited” at all. See id. at 14007 n.69. The conspicuous presence of a standardized notice specifying an opt-out mechanism helps to confirm that those recipients who don’t opt out actually agree to receive more ads, and are not left fuming and spluttering as they spend “considerable time and effort to determine how to properly opt out.” Id. at 14007.
Thus, the FCC’s regulation must be considered in light of Congress’s charge to the FCC to “prescribe regulations to implement” a regime that defines the capacious statutory phrase “prior express invitation or permission.” 47 U.S.C. § 227(b)(2), (a)(5). By promulgating this rule, the FCC sought to “implement” — to make meaningful and effective — its unchallenged view that “prior express invitation or permission” encompasses past permission that has not been delimited despite a reasonable opportunity to do so. See 29 F.C.C. Red. at 14006-07; 21 F.C.C. Red. at 3811-12.
The majority misses this because, in its telling, the Junk Fax Prevention Act’s requirement of an opt-out notice on unsolicited faxes sent pursuant to an established business relationship “is central to this case.” Maj. Op. at 1080. That account makes pivotal what is peripheral. The FCC has authority — pursuant to the general ban on unsolicited faxes and its mandate to implement that ban — to require an opt-out notice on all fax ads. The fact that Congress required an opt-out notice as a condition of treating unsolicited ads faxed to an established business partner as if they were solicited does not detract from the FCC’s preexisting authority to require opt-out notices on other faxed advertisements.
In my view, a different provision of the Junk Fax Prevention Act is more central to this case: Congress’s addition of the qualifier “in writing or otherwise” after “prior express invitation or permission.” See Pub. L. No. 109-21, § 2(g), 119 Stat. 359 (2005). In rulemaking to implement the Act, the FCC expressed concern that “permission not provided in writing may result in some senders erroneously claiming they had the recipient’s permission to send facsimile advertisements.” 21 F.C.C. Rcd. at 3812. The opt-out notice was one response to that concern; it would give recipients an easy way to make clear their consent vel non. The FCC knew well that without a standardized way to refuse unwanted ads these cases could become, in the words of one district court, a “factual morass” where the line between “solicited” and “unsolicited” is rather hazy. Physicians Healthsource, Inc. v. Stryker Sales Corp., 65 F.Supp.3d 482, 497 (W.D. Mich. 2014). That court held that, where advertisers bought lists of potential customers’ fax numbers from a professional associa *1085 tion whose members did not all want their ads, an “unequivocal requirement of a simple opt-out notice on every fax was the only way to give practical effect” to Congress’s ban on unsolicited ads. Id.
The majority nevertheless maintains that the FCC stepped over the “line” that Congress “drew” separating unsolicited ads (regulable) from solicited ads (non-regulable). Maj. Op. at 1082. But Congress drew no such line. Congress expressly delegated authority to the FCC to implement a prohibition on unsolicited ads, and the opt-out notice requirement does exactly that. The majority appears to assume that, by banning unsolicited ads, Congress implicitly forbade regulation of ostensibly solicited ads — even if the very purpose and effect of the regulation is to refine the definition of which ads count as solicited (and so permitted), and which are banned as unsolicited. We have said that the ex-pressio unius est exclusio alterius canon is “an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved.” Nat’l Ass’n of Mfrs. v. SEC, 748 F.3d 359, 367 (D.C. Cir. 2014) (quoting Cheney R. Co., Inc. v. ICC, 902 F.2d 66, 69 (D.C. Cir. 1990)), overruled in part on other grounds by Am. Meat Inst. v. U.S. Dep’t of Agric., 760 F.3d 18 (D.C. Cir. 2014) (en banc). This case reinforces that wisdom: The majority depends entirely on a negative implication from the rule’s proscription of “unsolicited” ads, thereby missing the point that the opt-out notice on all fax ads is part of the FCC’s simple and effective mechanism for differentiating solicited from unsolicited ads. In short, the opt-out notice requirement represents a means of implementing a given power, not the exercise of an unauthorized power.
The majority laments that petitioner Anda was “potentially on the hook” for $150 million in damages for failing to include an opt-out notice on “solicited” ads. Maj. Op. at 1081. But any such award would simply reflect Congress’s decision that, to prompt compliance, the requirement needed bite in the form of at least $500 in statutory damages for each violation. Congress wanted to put an end to unsolicited fax advertising. What is truly striking is how simply fax advertisers like Anda could have avoided such exposure by following the letter of the regulation and adding a few words to their standard faxes. See J.A. 986-89 (examples of compliant ads). While emphasizing the litigation risk faced by the fax-ad industry, the majority ignores Congress’s actual policy choice: to protect recipients from unwanted ads that waste their supplies, clutter their fax intake, and delay receipt of desired faxes. See H.R. Rep. No. 102-317, at 25 (1991); S. Rep. No. 102-178, at 2 (1991). Congress decided that its policy could best be enforced through a private right of action, and that statutory damages were necessary to encourage plaintiffs’ counsel to invest in private enforcement actions — an approach it apparently preferred over either non-enforcement or enlarged federal administrative capacity. If that policy is to be reversed, Congress — not this Court— must make that decision.
II.
Because its statutory ruling moots the issue, the majority does not reach the FCC’s decision to waive the opt-out notice requirement for all faxes sent before April 30, 2015. Maj. Op. at 1083 n.2.1 would hold that the FCC failed to establish good cause for that sweeping, retroactive waiver.
“The FCC has authority to waive its rules if there is ‘good cause’ to do so.” Ne. Cellular Tel. Co., L.P. v. FCC, 897 F.2d 1164, 1166 (D.C. Cir. 1990) (quoting 47 C.F.R. § 1.3). A waiver is appropriate *1086 “only if [1] special circumstances warrant a deviation from the general rule and [2] such deviation will serve the public interest.” Id. “The reason for this two-part test flows from the principle that an agency must adhere to its own rules and regulations, and ad hoe departures from those rules, even to achieve laudable aims, cannot be sanctioned.” NetworkIP, LLC v. FCC, 548 F.3d 116, 127 (D.C. Cir. 2008) (internal quotation marks and alterations omitted). Thus, an agency may grant waivers “only pursuant to a relevant standard” and “may not act out of unbridled discretion or whim in granting waivers any more than in any other aspect of its regulatory function.” WAIT Radio v. FCC, 418 F.2d 1158, 1159 (D.C. Cir. 1969). A waiver applicant “faces a high hurdle even at the starting gate” and must “plead with particularity the facts and circumstances which warrant” a waiver. Id. at 1157.
Here, the FCC did not establish that special circumstances and the public interest favor a broad retroactive waiver.
First, the FCC overstated the confusion that regulated parties reasonably could have experienced on reviewing the FCC’s handiwork — the sole “special circumstance” it identified. As the Eighth Circuit has noted, the “plain language” of the FCC regulation, as published in the Code of Federal Regulations, unambiguously required “solicited” faxes to include the opt-out notice. Nack v. Walburg, 715 F.3d 680, 683 (8th Cir. 2013). In light of the plain regulatory language, an errant footnote in the FCC’s explanatory order could not have caused significant reasonable confusion. As the FCC has conceded, “where a conflict exists between the text and a footnote in the same agency Order, established precedent provides that ‘the text of the [agency’s] decision controls.’ ” 29 F.C.C. Red. at 14010 n.97 (quoting United Steelworkers of Am., AFL-CIO v. NLRB, 389 F.2d 295, 297 (D.C. Cir. 1967)). Here, where the conflict was between the text of a published regulation and a mere footnote in the agency’s explanatory order, surely a prudent regulated party would undertake to follow the regulation. Nevertheless, the FCC did not require waiver-seekers to demonstrate that they were actually confused, or even that there was general confusion in the industry. Instead, the FCC accepted a waiver-seeker’s mere “reference to the confusing footnote language” as sufficient to establish “reasonable confusion” and, thus, special circumstances. Id. at 14009-10. The FCC thereby threw open the door to opportunistic waiver-seekers whose unsubstantiated claims could be surmounted only by (impossible-to-obtain) -evidence that they were not actually confused.
Second, the FCC failed to explain how its broad waiver serves the public interest. The FCC barely, even discussed the public interests served by its opt-out notice requirement, much less did it explain how granting a windfall to waiver-seekers with records of wholesale, prolonged violations of that requirement is consistent with those interests. The FCC asserted that the waiver would rescue confused businesses from the possibility of “significant damage awards.” 29 F.C.C. Rcd. at 14011. But the interest of regulated parties in avoiding congressionally authorized damages is not a “public” interest of the sort contemplated by our precedents. We have explained that public-interest waivers are for applicants whose conduct “will not undermine the policy, served by the rule, that has been adjudged in the public interest.” WAIT Radio, 418 F.2d at 1157. In other words, waivers are justified by reference to the same public interest that supports the general requirement — not by reference to regulated parties’ interest in avoiding costs the statute imposes as part of its enforcement mechanism. For instance, the FCC perhaps could have justified a target *1087 ed waiver for advertisers who violated some specifics of the requirement despite providing a reasonably clear but technically noncompliant means for recipients to opt out. See, e.g., J.A. 991-93. In any event, assuming a private interest might be one factor for the agency’s consideration, the FCC itself acknowledged it was not “an inherently adequate ground for waiver”— even as it failed to offer any adequate ground. 29 F.C.C. Rcd. at 14011.
In my view, the FCC thus “eviscer-at[ed]” its own rule via waiver, rather than employing the “limited safety valve” authorized by this Court’s precedents. WAIT Radio, 418 F.2d at 1159.
III.
Because the FCC validly implemented the congressional ban on “unsolicited” fax ads by requiring an opt-out notice on all fax ads, and failed to justify retroactively and indiscriminately waiving that requirement, I respectfully dissent.